Shannon COOPER, Plaintiff,

v.

UNIMIN CORPORATION, a Delaware corporation, Defendant and Third-Party Plaintiff,

v.

Judy CRAW, Larry Sawyer, and City Transfer, Inc., Third-Party Defendants.

Civ. No. 85–1022.

United States District Court, D. Idaho.

July 16, 1986.

C.H. Higer, Richard K. Linville, Emmett, Idaho, for plaintiff.

Joseph M. Imhoff Jr., Michael W. Moore, Patrick D. Furey, Boise, Idaho, for defendant and third-party plaintiff.

Quane, Smith, Howard & Hull, Boise, Idaho, for third-party defendants Larry Sawyer and City Transfer, Inc.

John Prusia, Caldwell, Idaho, for third-party defendant Judy Craw.

## MEMORANDUM DECISION

CALLISTER, Chief Judge.

The Court has received the Report and Recommendation (Report) of the United States Magistrate in this personal injury action. The Magistrate recommends denying the motions for summary judgment of the defendant and third-party defendants Larry Sawyer and City Transfer, Inc. (collectively referred to as the defendants hereafter). Defendants have filed their objections to the Report and the matter is now ready for decision.

This is a personal action brought by Shannon Cooper against Unimin Corporation. Unimin has sued Judy Craw, Larry Sawyer and City Transfer, Inc. as third-party defendants. Cooper was severely injured when he fell into a sandpit located on defendant Unimin's property.

The Court directed the parties to lodge with the Clerk of Court all depositions taken in this matter. From these depositions and the other materials on file in the case, the Court has constructed the following factual scenario, drawing all reasonable inferences in plaintiff's favor.

On November 5, 1984, plaintiff Cooper and four teenage friends spent part of the day "cruising" around the town of Emmett, Idaho, in plaintiff's car. In the early evening they were joined by another person, an adult named Judy Craw. Shortly after joining them, Craw purchased beer for the entire group. There is a dispute in the record as to how much beer was purchased and consumed. Sometime later that evening they drove up Old Freezeout road in the direction of the sandpits located outside of town. The purpose of this excursion is also disputed. Some of the deponents, including the plaintiff, indicated that the group was going to the monument, a place frequented by Emmett youth, to drink the beer and on the way they stopped to allow plaintiff to relieve himself. Cooper deposition, p. 58; Crews deposition, p. 28. Other testimony indicates that the group simply left town so plaintiff could relieve himself in a secluded spot. Womack deposition, pp. 29–31. Still other testimony indicates that the group actually went to the monument, drank the beer, and afterwards stopped by the sandpit to allow plaintiff to relieve himself before returning to town. Rowton deposition, pp. 28–39, 41–43; Jennings deposition, pp. 40–50. Some of the testimony is simply unclear. Belt deposition, pp. 29–34.

Regardless, plaintiff's vehicle ultimately arrived at a location near the north edge of the Unimin sandpit. At this point, a detailed description of this area and the precise location of plaintiff's vehicle becomes important. Old Freezeout is a paved road outside the town of Emmett. To enter the sandpit area, one must turn off the paved road onto a dirt- or sand-covered road. Down the dirt road is a gate located approximately 130 feet from the turn-off from the paved road. Attached or close to the gate was a "no trespassing" sign. Jennings deposition, pp. 16–20; Wood deposition, pp. 10–18. The gate is intended to block access to the remainder of the dirt road which curves around the edge of the sandpit and leads to the floor of the pit or further on to the monument, located 1½ to 2 miles beyond the pit. On each side of the gate was a berm (an embankment 4–5 feet high) which served as a further barricade to the sandpit area. The vertical wall of the sandpit, from which plaintiff fell, is located over 65 feet, at its closest point, from the gate. If one drives inside the gate, the dirt road proceeds approximately 90 feet directly toward the edge of the pit then curves sharply to the left and parallels the edge of the pit. At this curve, the

road is only a few feet from the edge of the pit.[1]

There is no dispute that the gate and attached sign were intact the day before the accident or even in the morning of November 5. Jennings deposition, pp. 16–20; Wood deposition, pp. 13–14; Sawyer deposition, generally. At the time of the accident, the gate had been knocked down and was lying on its side across the road. Who knocked the gate down on the day of the accident is unknown. Young people going to the monument frequently knocked the gate down to gain passage. Emmett law enforcement personnel often put the fence back up or requested that City Transfer, Inc., the actual operator of the pit, do so. Even if the gate were down before plaintiff's group arrived, the driver of a vehicle going over the downed gate could not avoid knowing of its presence. Brown deposition, pp. 12, 27; C. Rolland deposition, pp. 27–32; Jennings deposition, pp. 31–32.

Virtually all of the testimony, including plaintiff's, indicates that plaintiff parked his vehicle just *outside* the gate. *See, e.g.,* Craw deposition, pp. 41–42; Cooper deposition, pp. 71–76, 97–99. Only the testimony of Deputy Wood is to the contrary. He testified that John Crews, one of the youths in the car, told him that the Cooper vehicle had been parked *inside* the gate by the edge of the pit. Wood deposition, pp. 22–24, 47. After parking, plaintiff Cooper exited the vehicle, ran some distance, and fell over the edge of the pit.

The record is undisputed that the edge of the pit is not concealed in any manner, though it may have been somewhat difficult to see at night when this accident occurred. Wood deposition, pp. 41–42; C. Rolland deposition, pp. 37–39.

The property inside the fence is private property belonging to Unimin Corporation. It is unclear whether the portion of the dirt road extending from the gate to Old Freezeout road (the paved road) is public or private. Third-party defendant City Transfer was operating the pit under a contract with Unimin at the time of the accident. The sandpit is a well-known landmark in Emmett, although the existence of the vertical drop-off in question was not generally known at that time.

Defendants seek summary judgment on two basic grounds:[2]

1. Defendants are immune from liability under Idaho Code § 36–1604 because plaintiff's use or entry upon defendants' land was for recreational purposes;

2. Defendants owed no duty of care to the plaintiff under the common law *or* under state and federal statutory or regulatory provisions.

The Magistrate recommended denying summary judgment. The Court will discuss the two grounds for summary judgment in the same order listed above.

### A. *Idaho Recreational Use Statute*

■ Idaho's recreational use statute, Idaho Code § 36–1604 provides, in pertinent part:

(c) Owner Exempt from Warning. An owner of land owes no duty of care to keep the premises safe for entry by others for recreational purposes, or to give any warning of a dangerous condition, use, structure, or activity on such premises to persons entering for such purposes.

(d) Owner Assumes No Liability. An owner of land or equipment who either directly or indirectly invites or permits without charge any person to use such property for recreational purposes does not thereby:

1. Extend any assurance that the premises are safe for any purpose.

---

1. The preceeding geographical description is taken primarily from the affidavit and accompanying drawing of Ralph Kangas, a civil engineer; the Court also referred to the depositions and accompanying exhibits—which included handdrawn maps by the deponents.

2. The Magistrate listed three grounds for summary judgment but the issue of compliance with statutory or regulatory law is essentially one of duty and will be so discussed by the Court.

2. Confer upon such person the legal status of an invitee or licensee to whom a duty of care is owed.

3. Assume responsibility for or incur liability for any injury to person or property caused by an act of omission of such persons.

The issue is whether plaintiff's conduct comes within the ambit of the statute. The Court is only aware of and counsel have only cited to one Idaho case interpreting § 36–1604, that being *Johnson v. Sunshine Mining Company, Inc.*, 106 Idaho 866, 684 P.2d 268 (1984). *Johnson* held that plaintiff's motorcycling for pleasure on the defendant's land was sufficiently similar to the activities listed in the statute and therefore granted immunity to the defendant. *Id.* 684 P.2d at 270.

As already recounted, there is conflicting evidence in the record as to how plaintiff ultimately came to enter the defendant's land. Some of the witnesses stated in depositions that the plaintiff's group had simply driven from town (with the intention of going to the monument) and turned off the road in order to allow plaintiff to relieve himself. If this version is accepted the Court believes that the recreational use statute does not apply. Other witnesses indicated, however, that the group had been to the monument and had driven back to the vicinity of the sandpit's edge in order to allow the plaintiff to relieve himself. Under this version of the facts the statute could possibly cloak defendants with immunity.

For purposes of this motion, the Court must accept the version of the facts most favorable to the plaintiff. Accepting that version, the Court finds that there is a question of fact as to whether plaintiff's activity falls within the ambit of the recreational land use statute and thus summary judgment is inappropriate on this issue.

B. *Duty*

■ The Court turns next to the question of defendants' duty as possessors of land. The Magistrate, in his report, states that "in the classic trespasser situation, summary judgment would likely lie for the defendant." Report, p. 4. Like many other states which still group entrants upon land into the traditional "status categories," Idaho follows the general rule that possessors of land owe no duty of care to trespassers other than to refrain from wilfully or wantonly injuring them. Essentially, a possessor of land need only refrain from intentional tortious conduct. *Huyck v. Heclo Mining Company*, 101 Idaho 299, 612 P.2d 142, 144 (1980); W. PROSSER, *Handbook on the Law of Torts*, § 53 at p. 393 (5th ed. 1984). In *Huyck* the Idaho Supreme Court declined to reject the traditional status category rules that have been the law of Idaho for many years. *Huyck, supra*, 612 P.2d at 144. *Id.* As recently as 1984, the Idaho Supreme Court cited *Huyck* as good authority. *See Johnson, supra*, 684 P.2d at 271–73. The record clearly indicates that plaintiff was a trespasser upon the defendants' property. The Magistrate so concludes, although not without some ambiguity. Report, p. 4. The weak argument that somehow plaintiff is a licensee because of some "implied invitation" or consent to enter defendants' land is meritless; the Idaho Supreme Court rejected an identical argument in the *Huyck* case, *supra*, 612 P.2d at 143–44.

Defendant's conduct in this action was not wanton or willful. The Idaho Supreme Court has stated that mining or excavating activities to not rise to the level of wantonness or willfulness requisite to sustain a cause of action brought by a trespasser against a possessor of land. *Johnson, supra*, 684 P.2d at 272–73, citing to *Huyck, supra*. Therefore, under the general rule, defendants owe no duty to the plaintiff.

There are exceptions to the general rule that a possessor of land owes no duty of care to a trespasser under both the common law and the RESTATEMENT'S purported codification of the common law. Under one well-recognized exception, a possessor of land owes a duty where trespassers frequently and in significant numbers traverse a small portion of the landowner's property. PROSSER, *supra*, at pp. 395–96

(5th ed. 1984). Another exception, the so-called discovered or known trespasser rule, provides for a duty where the possessor of land actually knows of the trespasser's presence on the land and negligently allows him to be injured. PROSSER, *supra,* at pp. 396–99. These two exceptions are embodied, respectively, in RESTATEMENT (SECOND) OF TORTS §§ 335 and 337.

Plaintiff contends that these two exceptions, particularly the RESTATEMENT version of the exceptions, provide the requisite duty in the present case. The Magistrate concluded that it is likely that Idaho would embrace the RESTATEMENT exceptions and that questions of fact exist which preclude summary judgment. This Court disagrees. Even if Idaho does follow these exceptions, a matter not at all clear given the lack of reference to them in *Huyck* and *Johnson,* the Court finds that the exceptions are inapplicable as a matter of law and thus summary judgment is mandated.

1. *Restatement (Second) of Torts § 335.*

Section 335 of the RESTATEMENT (SECOND) OF TORTS provides:

§ 335. Artifical Conditions Highly Dangerous to Constant Trespassers on Limited Area

A possessor of land who knows, or from facts within his knowledge should know, that trespassers constantly intrude upon a limited area of the land, is subject to liability for bodily harm caused to them by an artificial condition on the land, if

(a) the condition

(i) is one which the possessor has created or maintains and

(ii) is, to his knowledge, likely to cause death or seriously bodily harm to such trespassers and

(iii) is of such a nature that he has reason to believe that such trespassers will not discover it, and

(b) the possessor has failed to exercise reasonable care to warn such trespassers of the condition and the risk involved.

The Court believes that plaintiff has failed to establish at least two elements of § 335, as a matter of law.

First, the record fails to show constant trespass on the specific area of defendants' land in question. The only evidence is that young people went down the dirt road to the floor of the sandpit or to the monument, both distinct areas on defendants' premises from the site of the accident. Jennings deposition, pp. 66–67; Elsberry deposition, pp. 29–32; Rowton deposition, pp. 40–41; Crews deposition, p. 82. The comments and illustrations to § 335 make clear that a "limited area" means just that. No evidence in the record indicates that young people partied near the edge of the pit or in the immediate vicinity above the pit.

Second, and more critically, the vertical drop-off at issue is not of such a nature that a trespasser would not discover it. The deposition testimony is clear that the sandpit and the drop-off are easily discernible and not concealed in any manner. Wood deposition, pp. 41–42; C. Rolland deposition, pp. 37–39. Plaintiff was unable to see the drop-off simply because it was dark and/or because he was inattentive. The defendants had no duty to guard the plaintiff against this type of risk. Comment f to § 335 makes a final, enlightening statement:

*The possessor is entitled to assume that trespassers will realize that no preparation has been made for their reception and will, therefore, be on the alert to observe the conditions which exist upon the land. In addition, he is also entitled to assume that they will be particularly careful to discover dangerous conditions which are inherent in the use to which the possessor puts the land.*

(emphasis added).

2. *Restatement (Second) of Torts § 337.*

Section 337 reads as follows:

§ 337. Artificial Conditions Highly Dangerous to Known Trespassers

A possessor of land who maintains on the land an artificial condition which involves a risk of death or serious bodily harm to persons coming in contact with it, is subject to liability for bodily harm caused to trespassers by his failure to exercise reasonable care to warn them of the condition if

(a) the possessor knows or has reason to know of their presence in dangerous proximity to the condition, and

(b) the condition is of such a nature that he has reason to believe that the trespasser will not discover it or realize the risk involved.

This section has no application to the case at bar. Unlike § 335, this theory comes into play only where the possessor of land actually knows of the trespasser's presence and that the trespasser is in dangerous proximity to the dangerous condition. PROSSER, *supra*, at pp. 396–98. No such state of facts exists here. In addition, § 337(b), like § 335, requires an undiscoverable or concealed hazard; as already discussed, none exists in this case.

The Court concludes that as a matter of law neither of the exceptions to the general rule of no duty to trespassers applies here.

3. *Restatement (Second) of Torts § 368.*

■ Plaintiff also relies on RESTATEMENT (SECOND) OF TORTS § 368, which is a codification of the common law rule that a possessor of land owes a duty of care, under certain circumstances, to those using public ways. PROSSER, *supra*, pp. 388–89. Section 368 provides:

§ 368. Conditions Dangerous to Travelers on Adjacent Highway.

A possessor of land who creates or permits to remain thereon an excavation or other artificial condition so near an existing highway that he realizes or should realize that it involves an unreasonable risk to others accidentally brought into contact with such condition while traveling with reasonable care upon the highway, is subject to liability for physical harm thereby caused to persons who

(a) are traveling on the highway, or

(b) foreseeably deviate from it in the ordinary course of travel.

The Court has no difficulty accepting that Idaho follows this long-established rule. Unfortunately, plaintiff's conduct falls outside the class of activities which § 368 was intended to protect—which is to say that defendants violated no duty to the plaintiff. Section 368 protects travelers while on the public way *or* while making a reasonable deviation from the public way for a purpose reasonably connected to travel. Comment g to § 368 is particularly insightful. Comment g states:

g. On the other hand, the rule stated in this Section does not apply where the traveler intentionally deviates from the highway for a purpose not reasonably connected with travel upon it. It does not apply, for example, where he intentionally and unnecessarily takes a short cut across the land, or steps out of the street to look at something in a window. Likewise this Section has no application where the deviation is one not reasonably to be anticipated, or is for a purpose not normally connected with the travel, as where the traveler runs off of the highway when pursued by criminals seeking his life. The distinction is thus not one between inadvertent and intentional deviations, but between those which are normal incidents of travel and those which are not.

*See also* comment e; PROSSER, *supra*, at p. 389.

The Court will assume that the dirt road where plaintiff parked on the night of November 5, 1984, is a public road to the point where the gate is located, although it is uncertain whether it is public even that far. If plaintiff parked his car by the gate, as he and most of the other witnesses indicate, § 368 offers no remedy to him.[3] As

---

3. If plaintiff actually drove through or over the gate to the point where the dirt road is only a

matter of feet from the drop-off, the Court reaches the same conclusion. Whether plaintiff

already described, on each side of the gate was an embankment. The evidence in the record, particularly the affidavit of engineer Ralph Kangas, establishes that the gate is located over sixty feet from the precipice from which plaintiff fell. The Magistrate's finding—and plaintiff's apparent contention—that plaintiff ran a "few feet" before going over the edge—go against the great weight of evidence in the record. While distance is not determinative in and of itself under § 368, the Court concludes that the edge of the sandpit was sufficiently far from the road that it did not constitute a recognizable danger to those using the road. Defendants erected a gate and made an embankment to restrict entry to this area, although the gate had apparently been knocked down shortly before the accident. There was also a "no trespassing" sign. Because of the gate and the distance to the edge of the pit, defendants had no reason to foresee that a passerby would be in any danger of injury as a result of their excavation.

Of greater significance, plaintiff's departure from Old Freezeout road *or* the dirt road was not for any purpose reasonably connected with travel upon that road. Plaintiff intentionally deviated from the road for reasons of his own—those reasons being unrelated to his use of the road itself. It flouts common sense to regard the act of urinating on open, private grounds to be in any way connected with the use of a public road. Even if the sand pit had been "a few feet" from the parked car, plaintiff would not come within the protection of the duty imposed by § 368 because his deviation from the public way was totally unrelated to ordinary travel purposes.

#### 4. *Duty Based on Statutory or Regulatory Provisions.*

Finally, the Court turns to plaintiff's assertion of a duty based upon statutory or regulatory provisions. Plaintiff relies on the following provisions:

1. The Idaho Minimum Safety Standards and Practices for Mining and Mineral Industry (Minimum Safety Act), Idaho Code § 44–101 *et seq.;*

2. The United States Mine Safety and Health Administration Safety and Health Standards (U.S. Mine Safety Regs.), 30 C.F.R. § 56 *et seq.;*

3. The Idaho Surface Mining Act, Idaho Code § 47–1501 *et seq.*

■ It is fundamental that in order for a statutory or regulatory provision to create a duty of care, the plaintiff must be within the class of persons that the statute or regulation was intended to protect. PROSSER, *supra,* at pp. 224–25. The Minimum Safety Act, by its terms, was intended to protect the safety and health of mine *employees.* Idaho Code § 44–103 (1974) (now repealed).[4] Likewise, the U.S. Mine Safety Regs. were intended to protect employees only. *See* 30 U.S.C. §§ 801, 803 and 811.

■ The Idaho Surface Mining Act may arguably include plaintiff within its class of protected persons but it creates no duty of care in his favor. A review of the statute reveals no affirmative duty to protect trespassers on mining lands. Further, the Act applies only after abandonment of the mine. Idaho Code § 47–1511(a). The record shows that no abandonment had occurred at the time of the accident. K. Rolland deposition, pp. 35–37.

The Court thus concludes that none of the statutory or regulatory provisions create a duty of care running from the defendants to the plaintiff. Neither can plaintiff establish a duty based on the common-law exceptions to the general rule of no tres-

---

traversed the road between the gate and the point near the drop-off on foot or by car is immaterial—either way the departure from the public way is unconnected with any travel purpose.

4. The Idaho legislature acted in 1980 to abolish the power of the Labor and Industrial Services relevant to mine safety. *See* Idaho Code § 44–101 (1980). For that additional reason, the Court believes that plaintiff cannot rely on the Minimum Safety Act.

passer liability. The Court grants the motions for summary judgment.